Melvin Moul v. Commissioner.
Moul v. Commissioner.
Docket No. 22180.
United States Tax Court
1951 Tax Ct. Memo LEXIS 288; 10 T.C.M. (CCH) 286; T.C.M. (RIA) 51091; March 21, 1951
Albert E. Saunders, Esq., 11 Beacon St., Rm. 320, Boston, Mass., for the petitioner. Leo C. Duersten, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income tax for the calendar years 1943, 1944, and 1945 in the amounts of $3,483.17, *289 $12,185.40, and $27,755.79, respectively. The principal issue with respect to 1943 is whether an indebtedness to petitioner in the amount of $5,347.75 became worthless in 1943. The principal issue with respect to 1944 and 1945 is whether a partnership agreement executed on August 3, 1943, with respect to a poultry business theretofore conducted by petitioner as sole proprietor is effective to require allocation during 1944 and 1945 of the income for tax purposes among petitioner, his wife and two children in accordance with the stated percentages in the partnership agreement. Since there was a net loss in 1943 in the operation of the business after the execution of the agreement, the Commissioner proposed to allow that loss in full to the petitioner in accord with his determination to refuse to recognize the partnership for income tax purposes. Findings of Fact Some of the facts are set forth in a stipulation which is hereby adopted. Petitioner, an individual residing in Brentwood, New Hampshire, filed his income tax returns for the calendar years 1943, 1944, and 1945, prepared on the accrual method of accounting, with the collector of internal revenue for the district of *290 New Hampshire. 1. Partnership issue. Petitioner married Bernadette C. Moul in 1920, and their two children, Maurice and Violet, were born on August 8, 1921, and May 19, 1923, respectively. In 1923, he and his family moved to Brentwood. He worked from 1923 until 1930 as a wood heel turner in a factory. Brentwood is predominantly a rural, agricultural community, and petitioner and his family lived on a small farm. Although neither petitioner nor his wife had any capital of any consequence, petitioner, with his wife's assistance, started a poultry business in 1923 with twenty-seven chickens. His wife fed the chickens, watered them and picked up the eggs. Petitioner would take over in the evening, after he had completed his work at the factory. As the poultry business progressed, his wife increased her efforts. By 1927 there were 400 to 500 hens. In 1927, petitioner borrowed $850 from his mother, with which he bought an incubator, thus enabling the poultry business to operate a hatchery. Prior thereto, the principal operation consisted of the production of eggs for other hatcheries. He subsequently repaid the money that he borrowed from his mother. He also borrowed $1,200 from his *291 father to buy his farm. Beginning in 1930, petitioner ceased work in the factory, and devoted his entire time to his poultry business, which was known as Moul's Poultry Farms. The business is classified as a breeder hatchery, which is concerned primarily with the production of eggs, the hatching of eggs and the sale of day-old chicks. From the period 1923 to 1930 there were no outside employees, but petitioner's father-in-law occasionally would help several months at a time. During the early thirties, two boys were hired to help in the business; they boarded at the farm, and petitioner's wife took care of them, in addition to her household duties and her increased activity in the business. At some undisclosed time petitioner acquired property about a mile and a quarter from his home. That property contained some mills or factory buildings which petitioner converted to hatchery purposes; it was referred to as the "hatchery" in contrast to the "farm" upon which he lived. There was an office at both the farm and the hatchery, and business was transacted at both places. In the period from 1937 to 1940, petitioner employed approximately 30 regular employees. At that time the volume *292 of chicks hatched was approximately 3,500 a week. During the war, the number of regular employees dropped to 9, but petitioner continued to employ an undisclosed number of high school students on a part-time basis. By 1943, chicks were produced at the rate of 85,000 a week. Petitioner's wife assisted actively both at the farm and at the hatchery. During the years 1942, 1943, and 1944, it was often necessary for petitioner to travel, and while he was away his wife was in full charge of the business. A joint savings account was opened in 1939 in the names of petitioner and his wife. The initial deposit was $160; by July 1, 1943, the balance had increased to over $30,000, and it increased steadily thereafter until it reached over $40,000 in 1946. His wife also had a savings account in her own name which was opened in February 1944. Deposits in the latter account aggregated less than $1,000 during 1944, but were in excess of $9,000 during the first seven months of 1945; a subsequent withdrawal left a balance of $8,345.30 at the end of 1945. Maurice Moul, petitioner's son, was a student at Austin Cate Academy, where he studied agriculture, and, after attending Tilton Preparatory School, *293 he entered Cornell University in 1941, where he began to major in poultry. However, his studies at Cornell were interrupted by his entry into active military service. He was in the Army from July 8, 1942, until December 2, 1945. He left the continental limits of the United States on August 21, 1943, and returned to the United States on November 26, 1945. As a child, and during summers and vacations while at school, he did various chores at the farm and the hatchery, such as helping clean the poultry houses, taking care of the poultry, feeding poultry, watering, gathering eggs, unloading grain, grading eggs, grading chicks, and making boxes. Apart from summers and vacations, he did not work full time, nor were his services of a vital or managerial character. Upon his return from military service in December 1945, there was a critical shortage of help, and he worked in the hatchery. Petitioner's daughter Violet attended grammer school, high school, and business college. She completed business college in June 1943 and was married in September 1943. She performed incidental clerical services in the hatchery office under the supervision of Gertrude A. Tibbetts, a full time bookkeeper *294 whose salary ranged from $35 to $45 a week. Violet's work at the office was intermittent and consisted of such duties as addressing and filing index cards. She also worked at the hatchery, grading eggs, taking chicks out of trays, and grading chicks. Prior to graduation from business college, she had rendered similar assistance during vacations and after school hours. When Violet began to work full time in 1943, upon leaving business college, she was paid $25 a week. Her work throughout the remainder of 1943 and during 1944 and 1945 was of the same general character. Her services were of a routine nature and were worth $25 a week For the period from 1923 up to the date of the execution of the partnership agreement of August 3, 1943, hereinafter described, the business of Moul's Poultry Farms was conducted by petitioner as sole proprietor. His net profits from the business for the calendar years 1939-1942, and for the period from January 1, 1943, to August 1, 1943, as reflected on the books and records of the proprietorship were as follows: 1939
$ 6,640.14
1940
2,075.45
1941
22,279.21
1942
30,967.66
1/1/43 to 8/1/43
102,583.54
The income from the business *295 for the period August 1, 1943, through December 31, 1943, and for the calendar years 1944 and 1945, as disclosed on partnership information returns, was as follows: 8/1/43 to 12/31/43
($634.23)
1944
$44,300.32
1945
86,294.99
On August 3, 1943, petitioner, "in consideration of the love and affection which I have for my wife Bernadette C. Moul, my daughter Violet Ruth Moul, and my son Maurice W. Moul," executed an instrument which undertook to convey "Four undivided tenths" of certain real estate used in the business of Moul's Poultry Farms to Bernadette C. Moul, to George E. Wright as trustee for Maurice W. Moul, and to George E. Wright as trustee for Violet Ruth Moul during her minority. Bernadette C. Moul in the same instrument released her right of dower and homestead in the real property. On the same day, petitioner executed a "Bill of Sale", reciting the same consideration as above, which undertook to transfer to Bernadette C. Moul, Maurice W. Moul, and George E. Wright as trustee for Violet Ruth Moul during her minority "Four Undivided Tenths parts of the personal property used in my business at said Brentwood operated by me under the name and style of Moul's *296 Poultry Farm." The foregoing transfer of personal property to Maurice was not in trust. On August 3, 1943, petitioner, Bernadette C. Moul, and George E. Wright, purporting to act for Violet and Maurice, executed a purported partnership agreement with respect to the poultry business theretofore conducted by petitioner as sole owner. Among the provisions of the agreement were the following: * * *
"4. The capital of said firm shall be in the sum of Eighty Thousand Eight Hundred Forty-one Dollars and ninety-seven cents ($80,841.97) subscribed as follows: The undivided interest of the partners Bernadette C. Moul, Violet Ruth Moul, and Maurice W. Moul, heretofore conveyed to them by Melvin Moul is determined to be to the value of Thirty-Two Thousand Three Hundred Thirty-six Dollars and seventy-nine cents ($32,336.79) and represented by such undivided interest in real estate and personal property now situate on the premises formerly owned in fee by the partner Melvin Moul; the undivided interest of Melvin Moul in said land, buildings, and personal property owned in common with the other partners being in the sum of Forty-Eight Thousand Five Hundred and five Dollars and eighteen cents *297 ($48,505.18). "5. It is agreed that in no event shall any one of the parties withdraw from the firm any amount which will reduce the capital account of the same below the total amount herein stated as the combined subscriptions of all the parties hereto. "6. The financial business and affairs of this partnership shall be under the management of the partner Melvin Moul who shall determine, from time to time, the amount of profits to be divided and the parties shall be entitled to share only in profits in accordance with his sole determination. "7. The partner Melvin Moul shall be entitled to draw from the partnership funds such sum or sums as he shall consider to be his just compensation for the services rendered to the partnership in the management of the affairs of the partnership, the amount so drawn to be charged against the anticipated payments of profits on a pro-rata basis in consideration of the subscription or contribution of each partner to the capital of the firm in that it shall be deemed to be an expense of the business. "8. The profits arising out of the conduct of the business shall be divided as follows: Melvin Moul, Sixty per cent (60%), Bernadette C. Moul, *298 Thirteen and one-third per cent (13 1/3%), Violet Ruth Moul, Thirteen and one-third per cent (13 1/3%), Maurice W. Moul, Thirteen and one-third per cent, (13 1/3%); and the losses shall be borne in the same proportion. "9. The partner Melvin Moul agrees to devote his entire time, skill, and energy to the business interests of the partnership during the continuance thereof and the remaining partners agree to devote such time, skill, and energy to the interests of the business of the partnership as shall be requested and determined by the partner, Melvin Moul. "10. Full, just, true, and accurate accounts shall be kept of all matters relating to the business to be conducted by the partnership and a semi-annual report of the progress and business of the partnership shall be given by the partner, Melvin Moul, to the other partners upon request. * * *
"13. No partner shall execute or endorse personal notes or other obligations without notification to the other partners that he proposes to do so, nor shall any of the partners without the consent in writing of all the other partners in any way use the firm name or credit either directly or indirectly by endorsement guaranty, or *299 otherwise except for firm business with the exception that Melvin Moul, as manager of the partnership, may make such commitments in the name of the partnership without the consent of the other partners." The partnership agreement was not signed either by Violet or Maurice. Violet did not have any discussion with her father about the partnership agreement prior to its execution, and she first learned about it some time thereafter. There was no change either in her duties or responsibilities after the execution of the agreement. Her services were not vital, nor did she serve in any way in an executive or managerial capacity. Petitioner's purpose in executing the partnership agreement was to effect a reduction in his Federal income taxes. His accountant, Sanford G. York, counseled against the formation of the partnership. After the execution of the agreements of August 3, 1943, Sanford G. York, petitioner's accountant, opened a new set of books. The following credit entries were made to the capital account: Melvin Moul (60%)
$48,505.18
Bernadette Moul (13 1/3%)
10,778.93
Violet R. Moul
10,778.93
Maurice W. Moul
10,778.93
As of December 31, 1944, and December 31, 1945, the *300 following credit entries appear in the General Ledger of Moul's Poultry Farms to the account entitled "Capital": 12/31/44
Melvin Moul
$26,541.19
12/31/44
Bernadette Moul
5,898.05
12/31/44
Maurice Moul
5,898.04
12/31/44
George E. Wright,
trustee for Violet
Moul
5,898.04
12/31/45
Melvin Moul
51,734.39
12/31/45
Bernadette Moul
11,496.53
12/31/45
Maurice Moul
11,496.54
12/31/45
Violet Moul
11,496.53
After the execution of the partnership agreement on August 3, 1943, there was no change in the conduct of the business. Petitioner conducted the business after August 3, 1943, in much the same manner as he had done when it was carried on as a sole proprietorship. During the calendar years 1943, 1944, and 1945, no partnership meetings were held. Petitioner remained responsible, after the execution of the partnership agreement, for the financial affairs of the business as he had been prior thereto. During the calendar year 1943, petitioner obtained a $69,000 loan for the partnership from the Rockingham National Bank at Exeter, New Hampshire. He alone signed the note. Petitioner told Violet that he was going to get the $69,000 loan but he neither *301 requested nor did she voice her approval of the loan. After execution of the partnership agreement on August 3, 1943, petitioner did not advise any of the agents who sold chickens for him that a partnership had been formed, nor did he advise any of his customers that the business was being conducted as a partnership. After the execution of the partnership agreement, no bank accounts were maintained or opened for the business. The partnership agreement was not registered with the Ofice of the Secretary of State for the State of New Hampshire, as required by Chapter 186, sections 1 to 10 of the Revised Laws of New Hampshire. Petitioner did not notify the insurer of the assets of the proprietorship, subsequent to August 3, 1943, that the partnership agreement had been executed and the contracts of insurance for fire, theft, hail, and public liability were not changed to insure the assets of the partnership. On October 4, 1943, George E. Wright executed a document in which he recited that he had been designated as trustee for petitioner's children, Maurice and Violet, with respect to certain interests in the real estate and business of petitioner, and he undertook to bind himself as *302 trustee for Maurice and Violet. However, he had never in fact received any personal property on behalf of Maurice. His duties as trustee were inconsequential. He was never consulted, as trustee, with respect to the operation of the business. He opened no bank accounts for either of the beneficiaries, nor did he, as trustee, receive any distributions on account of either of them. He did not have in his possession the separate savings bank books that were maintained in the names of Violet and Maurice. These bank books disclosed three deposits in the amount of $2,400 each and one in the amount of $3,000 on behalf of Maurice in 1945, which represented withdrawals from the business. Maurice was wholly unaware of these deposits, and manifested surprise when the bank book was delivered to him by his father upon his return from military service. During 1945 there were three deposits of $2,400 each and one in the amount of $2,450 in Violet's savings account. These deposits were made by petitioner and represented withdrawals from the business. Petitioner did not in fact really and truly intend to join together with his children Violet and Maurice for the purpose of carrying on and conducting *303 a business as a partnership during the calendar years 1943, 1944 and 1945. Petitioner did in fact intend to join with his wife in the conduct of the poultry business as a partnership on August 3, 1943, and thereafter during the taxable years. 2. Bad debt issue. From 1934 to 1943, Norman C. Calhoun sold chicks for petitioner at Ocean View, Delaware. Calhoun also purchased chicks which he raised for sale to his own customers. He sold an undisclosed amount of poultry to the Agar Poultry Company, which went into receiver hip or bankruptcy in 1943. As a consequence of Calhoun's dealings with petitioner, he became indebted to petitioner in 1943 in the amount of $5,347.75. Calhoun enlisted in the United States Coast Guard on November 30, 1943, and was discharged on September 5, 1945. He was unable to pay his obligation to petitioner in 1943, but he executed two notes in the aggregate amount of his debt to petitioner. In addition, in the latter part of 1943 or the early part of 1944, he assigned and delivered to petitioner, as collateral, a contract of life insurance on his (Calhoun's) life in the face amount of $5,000. The insurance contract was a thirty payment life policy issued by *304 the Equitable Life Assurance Society. Petitioner was designated as irrevocable beneficiary, and Calhoun paid the premiums thereon, both before and after the assignment. Petitioner and Calhoun had an understanding that when Calhoun returned from military service, he was to resume selling chicks for petitioner, and that commissions upon sales would be credited as payments on the notes. Subsequent to Calhoun's return to civilian life, he in fact made payments on the notes. At the time of the hearing, November 1949, the unpaid balance amounted to $850. The $5,347.75 indebtedness of Norman C. Calhoun did not become worthless in the calendar year 1943. Opinion RAUM, Judge: 1. Partnership issue. The question for decision is whether, "considering all the facts * * * the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise". . Cf. ; . Our task is to apply the principles recognized and established by the foregoing decisions to the peculiar facts of this case. *305 We have carefully reviewed the entire record and are of the opinion that petitioner did not in good faith intend to join with his two children as partners in the conduct of the poultry business duing the taxable years. Apart from provisions of the partnership agreement which gave petitioner virtually plenary control over the operation of the business and the provisions which enabled him to draw from the partnership funds "such sums as he shall consider to be his just compensation" for his services, the circumstances surrounding the creation of the alleged partnership and its actual operation during the taxable years satisfy us, beyond doubt, that petitioner did not in good faith join together with his children as partners during the taxable years. Violet did not even know of the partnership until some time after the execution of the agreement of August 3, 1943. Although she helped out in the business, her services were of a routine nature and were worth only $25 a week. She in no way participated in the management of the enterprise or rendered vital services. Nor did George E. Wright participate in any way as trustee for Violet in the conduct of the business. Whatever services, if *306 any, that he performed as a trustee were of an inconsequential character. Petitioner's son Maurice was in active military service for more than a year prior to the execution of the August 3, 1943, agreement, and was outside the continental limits of the United States during most of the period after August 3, 1943. When he entered military service in 1942, he had not yet completed his education, and the services which he had rendered to the business prior thereto were merely during vacations and after school hours. The unreality of the alleged partnership, at least as to Maurice, is confirmed by the fact that although petitioner undertook to transfer to him a portion of the assets of the business, real and personal, so that Maurice could in turn contribute such portion as his share of the partnership capital, only the real estate was in fact contributed. The real estate was conveyed to George E. Wright as trustee, and Wright signed the partnership agreement. As to the personalty, however, petitioner's instrument of transfer purported to give Maurice his share outright. But Maurice never signed the partnership agreement, and Wright certainly had no authority to contribute such personal *307 property to the alleged partnership on behalf of Maurice. We are convinced from all of the facts that need not be summarized at this point that what was involved was merely a series of paper transactions without any intention by petitioner to carry on business in partnership with his children during the years before us. We reach a different result as to petitioner's wife. Although many of the facts pointing to the unreality of the arrangement with respect to the children are likewise pertinent here, nevertheless we think that there is a substantial basis for recognizing the wife's 13-1/3 per cent interest in the enterprise. In the early days of the business, between 1923 and 1930, she gave continuous supervision to its operations, while petitioner worked in a factory. She was active in the business during its entire life. A joint savings account opened in 1939 in the names of husband and wife reflected the understanding that the fruits of the business were attributable to their joint efforts. And when it became necessary for petitioner to travel on numerous occasions during 1942, 1943 and 1944, his wife remained in charge. We conclude that a valid partnership was established with *308 respect to petitioner's wife, and that her allocable share of income may not be attributable to petitioner. His distributable share of the income from August 3, 1943, to December 31, 1945, was 86 2/3 per cent. Petitioner has made an alternative argument that if the partnership is not recognized, he is entitled to deduct in 1944 and 1945 the sums paid to his partners as "fair and reasonable salaries for the services which they actually rendered to the petitioner" and also as rentals or other compensation for the use of their capital in the conduct of the business. We have found that Violet's services were worth only $25 a week, and we hold that deductions are allowable with respect to her services only in the amount of $1,300 for each of the years 1944 and 1945. Since Maurice did not perform any services during the taxable years, apart from some assistance during the month of December, 1945, which may be disregarded in the absence of satisfactory proof showing the nature and extent of such assistance, no such deductions are available as to him. Nor has any basis been established in this record for the allowance of deductions by the way of interest, rentals or otherwise with respect *309 to the alleged contributions of capital by Violet or Maurice. 2. Bad debt issue. We are thoroughly satisfied from the facts, which we have set forth in our findings, that Calhoun's indebtedness to petitioner did not in fact become worthless in 1943. The claimed deduction must accordingly be disallowed. Decision will be entered under Rule 50.